IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LATOYA HUNT,                          *

    Plaintiff,                       *

v.                                    *          Civil Action No. GLR-25-2724

CAROLYN SCRUGGS, et al.,             *

    Defendants.                      *

                                   ***

**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on Defendants Danielle Callahan, Carolyn Scruggs, and Kerri Smith's (collectively, "Defendants") Motion to Dismiss (ECF No. 22). The Motion is ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2025). For the reasons set forth below, the Court will grant the Motion to Dismiss in part and deny it in part.

## I.    BACKGROUND

**A.    <u>Factual Background</u>**[1]

In August 2023, Plaintiff Latoya Hunt began working as a parole and probation agent I with the Maryland Department of Public Safety and Correctional Services ("DPSCS" or "Department") Division of Parole and Probation at their Elkton office. (Compl. ¶ 14, ECF No. 1). Hunt identifies as an African American woman. (<u>Id.</u> ¶ 13).

---

[1] Unless otherwise noted, the Court takes the following facts from the Complaint (ECF No. 1) and accepts them as true. <u>See</u> Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Defendant Kerry Smith, a white Caucasian woman who serves as Field Supervisor I, was assigned to supervise Hunt. (Id. ¶ 19).

Hunt alleges that, at the outset, Smith was a bad supervisor and treated her differently from her similarly situated colleagues. (See id. ¶¶ 26, 37 n.5). For example, as a new employee, Hunt was required to attend a training program located in Sykesville, Maryland, but Smith did not help Hunt with assignments that Hunt needed to complete to graduate from the training program. (Id. ¶¶ 24–28). When Hunt ultimately graduated from the training program and was ready to take on her own cases, Smith staffed Hunt with a sixty-case caseload. (Id. ¶¶ 35–37). Hunt alleges that "[n]one of the other white Caucasian agents similarly situated such as Ms. Erin Tracy and Mr. Jordan Ramsburg had to start out with sixty (60) cases transferred to them." (Id. ¶ 37 n.5).

Smith's behavior only got worse. For example, around December 2023, when Hunt turned in an assignment, Smith "snatched" the folder out of Hunt's hand, "flipped" the folder open, told Hunt that she was missing documents, and then proceeded to "berate Ms. Hunt in an aggressive manner." (Id. ¶¶ 40–46). Hunt felt so uncomfortable by this interaction that she emailed Smith and copied the management team, including Field Supervisor II, Defendant Danielle Callahan, a white Caucasian woman, to let them know it occurred. (Id. ¶ 47). Callahan acknowledged receiving the email but did nothing further. (Id. ¶ 49). Instead, another one of Hunt's colleagues "acted as a meditator" in a meeting between Hunt and Smith. (Id. ¶ 50). In that meeting, Hunt mentioned how uncomfortable Smith made her. (Id. ¶ 52). Hunt alleges that "[d]espite [Smith] indicating that she got along with all the other African American employees . . . numerous complaints have been

made regarding [Smith's] treatment of African American employees." (Id. ¶¶ 54–55). Hunt

explains several instances in which other African American agents were treated differently

than their white counterparts, including, for example, Defendants Smith and Callahan

bullying other African American agents or not giving them opportunities for promotion.

(Id. ¶¶ 55–64).

According to Hunt, the hostility only continued. For instance, around January 2024,

Smith was editing one of Hunt's assignments in her office when "Smith threw her hands

in the air and screamed, 'I am just trying to help you.'" (Id. ¶ 69). Smith alleges that

"Defendant Smith's hands were so close to Ms. Hunt's face that she had to take a step back

to avoid being hit by Defendant Smith." (Id. ¶ 70). After this interaction, Hunt spoke to

Callahan over the phone and expressed her concern about the hostile environment that

Smith created. (Id. ¶ 72). Hunt also expressed that she would not be successful in her job

if Smith continued to supervise her and asked whether Callahan would transfer her to a

different supervisor. (Id. ¶¶ 72–73). Callahan refused to transfer Hunt to a different

supervisor. (Id. ¶ 73).

On another occasion, on or around January 19, 2024, when Callahan called Hunt to

advise her that more work needed to be done on one of the cases that was assigned to Hunt,

Hunt could hear Smith "laughing in the background as if she was laughing at Ms. Hunt."

(Id. ¶ 80). Hunt felt so alone and unassisted by Smith that she called her Union to help her.

(Id. ¶ 83). All the while, Smith continued to make unreasonable requests, including, for

instance, requiring Hunt to provide reports for individuals without court dates, despite

initially telling her not to do this. (Id. ¶ 84). In addition to unreasonable demands, Hunt

also alleges that Smith "spread[] lies" about Hunt's prior employment by telling colleagues that Hunt was fired from the Sherriff's office. (Id. ¶¶ 85–87). Indeed, Hunt alleges that Smith's behavior escalated—"[i]n addition to the bullying, Defendant Smith was intentionally and maliciously trying to hurt Ms. Hunt with this smear campaign." (Id. ¶ 87).

Such instances of Smith bullying Hunt or making unreasonable demands only continued. (Id. ¶¶ 89–101). On another occasion, Hunt confided in a colleague that she was "tired of being mistreated by [Smith] . . . [and] that she was suffering a mental breakdown as a result." (Id. ¶ 104). That day, Hunt received permission to leave work early because of how distraught she was and immediately contacted her therapist. (Id.).

On January 22, 2024, Hunt finally voiced her concerns to Ronnie Coleman, a Regional Administrator at DPSCS, about how Smith and Callahan were treating her. (Id. ¶ 88). Coleman said she would speak with Smith and Callahan to correct the issues, but nothing changed. (Id.). Later, on March 25, 2024, Hunt again spoke with Coleman about Smith. (Id. ¶ 106). Coleman asked Hunt to memorialize her complaint in writing and to send it to him. (Id.). Coleman notified Hunt that, effective immediately, she would transfer Hunt to Field Supervisor I Kari Wiechel's team for supervision. (Id. ¶¶ 47, 106). Hunt alleges that even after Coleman transferred her, however, this "relief was short-lived." (Id. ¶ 107). For example, Smith still refused to help Hunt or Hunt's clients. (Id.).

Hunt acknowledges that the Department investigated the workplace environment at the Elkton field office. (Id. ¶ 108). To that end, on April 11, 2024, Robert Hudley and Veronica Clerk, Regional Supervisors at DPSCS, interviewed Hunt about her experiences but no one ever provided Hunt with updates regarding the investigation. (Id. ¶¶ 108–109).

4

Even after others got involved, however, Hunt alleges that the differential treatment continued. For example, Hunt alleges that a new agent, Erin Tracy, a white Caucasian female, eventually started working at the Elkton field office with Hunt. (Id. ¶ 110). Hunt alleges that "[a]s a white Caucasian female, Ms. Tracy was treated differently from her darker-skinned African American counterparts. Defendant Smith attended Ms. Tracy's graduation, assisted Ms. Tracy in writing reports, went to court for her, was more hands-on with Ms. Tracy, and gave her easier and less time-consuming workloads." (Id. ¶ 115). Hunt alleges that other white Caucasian agents received either less cases or no cases after graduating from training, even though Smith assigned Hunt sixty cases. (Id. ¶¶ 116–117). Smith also singled Hunt out by limiting her ability to work in the office past 7 p.m., which would prevent Hunt from receiving flextime pay. (See id. ¶¶ 130–131).

On or around August 2024, Hunt began communicating with Lavonya Moody, a Senior Advisor at DPSCS, about her complaints regarding Smith and Callahan. (Id. ¶ 135). On August 22, 2024, Hunt filed a Complaint with the Office of Fair Practice and Inclusion Equal Employment Opportunity Unit, alleging that she was the subject of workplace bullying and unfair employment practice. (Id. ¶ 139). On August 30, 2024, Callahan sent an email to the office indicating that Defendant Smith would be reassigned to the Bel Air Office effective September 11, 2024. (Id. ¶ 140). Hunt alleges that the Office of Fair Practice and Inclusion determined there was sufficient evidence to support a probable cause finding that Hunt was subjected to workplace bullying and unfair employment practices, but that Smith and Callahan remain employed and in contact with Hunt. (Id. ¶¶ 143–146).

**B.      Procedural History**

Hunt filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶¶ 9–11).[2] The EEOC issued a Right to Sue Letter on May 19, 2025. (Id. ¶ 10). On August 18, 2025, Hunt filed a Complaint against Danielle Callahan, Carolyn Scruggs, and Kerri Smith. (ECF No. 1). The eight-count Complaint alleges discrimination based on race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Count I); retaliation in violation of 42 U.S.C. § 1981 (Count II); racial discrimination in violation of 42 U.S.C. § 1981 (Count III); retaliation in violation of Title VII (Count IV); harassment, discrimination, and retaliation in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't. § 20-601, et seq. (Counts V, VI); negligence (Count VII); and negligent supervision (Count VIII). (Compl. ¶¶ 152-241). On December 29, 2025, Defendants filed a Motion to Dismiss. (ECF No. 22). Hunt filed her Opposition on March 2, 2026. (ECF No. 26). On March 27, 2026, Defendants filed a Reply. (ECF No. 29).

## II.      DISCUSSION

**A.      Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it

---

[2] Hunt does not specify the date of the EEOC Charge.

does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

A defendant challenging a complaint under Rule 12(b)(1) may advance a "facial challenge, asserting that the allegations in the complaint are insufficient to establish subject

matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" Hasley v. Ward Mfg., LLC, No. RDB-13-1607, 2014 WL 3368050, at *1 (D.Md. July 8, 2014) (quoting Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009)). When a defendant raises a facial challenge, the Court affords the plaintiff "the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Kerns, 585 F.3d at 192 (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). As such, the Court takes the facts alleged in the complaint as true and denies the motion if the complaint alleges sufficient facts to invoke subject-matter jurisdiction.

**B.      Analysis**

**1.      Immunity**

The Court will first address Defendants' various arguments related to immunity or other statutory bars. (Defs.' Mem. L. Supp. Mot. Dismiss ["Mot."] at 13–16, ECF No. 22-2).[3] Defendants assert that they are entitled to immunity under the Eleventh Amendment from Hunt's claims under the MFEPA and 42 U.S.C. § 1981. (Id.). The Court agrees that the Eleventh Amendment bars Hunt's claims under the MFEPA against the Department and its actors in their official capacity. (Id. at 16); see Perkins v. Univ. of Md., Balt Sch. of Nursing, No. RDB-24-1688, 2025 WL 1371486, at *5 (D.Md. May 12, 2025) ("[Plaintiff's] MFEPA claims [against an instrumentality or arm of state] are barred by sovereign immunity under the Eleventh Amendment."); Just Puppies, Inc. v. Frosh, 438 F.Supp.3d 448, 482 (D.Md. 2020) ("State officers sued in their official capacity are also entitled to

---

[3] Citations to the page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

Eleventh Amendment immunity because such a suit 'is not a suit against the official but rather is a suit against the official's office.'") (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 70 (1989)). Additionally, the Court agrees that Hunt's 42 U.S.C. § 1981 claims against the Department and the individual Defendants in their official capacities are also barred because § 1983 is the "exclusive federal remedy for violation of the rights guaranteed in § 1981" and Hunt did not plead a § 1983 violation. (Mot. at 13–14; Defs.' Reply Supp. Mot. Dismiss at 4, ECF No. 29 (quoting Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995))).

Further, the Court notes, and Hunt does not contest, that Title VII claims cannot be brought against individually named defendants. (See Pl.'s Opp'n Defs.' Mot. Dismiss ["Opp'n"] at 1, ECF No. 26 ("Plaintiff does not pursue individual-capacity Title VII liability. . . . To the extent Defendants seek dismissal of individual-capacity Title VII claims against Ms. Smith, Ms. Callahan, or Secretary Scruggs, Plaintiff does not oppose that limited clarification.")). The same goes for Hunt's MFEPA claims against Smith and Callahan in their personal capacities. See Brown v. Town of Capitol Heights, No. 25-1336-TDC, 2026 WL 472821, at *4 (D.Md. Feb. 19, 2026) ("As a preliminary matter, the Court will dismiss the . . . Title VII and MFEPA claims for employment discrimination . . . against the Individual Defendants, because Title VII and MFEPA claims must be asserted against the employer . . . and may not be asserted against supervisors or managers in their individual capacities.").

Even so, however, none of these limitations categorically bar Hunt from proceeding with claims under 42 U.S.C. § 1981 against Smith and Callahan in their personal capacities.

9

See Windsor v. Bd. of Educ. of Prince George's Cnty., No. TDC-14-2287, 2016 WL 4939294, at \*14 (D.Md. Sep. 13, 2016) (granting Defendants' motion to dismiss § 1981 claims "as to the claims against the Board and the Individual Defendants in their official capacities, but den[ying the Motion] as to the claims against the Individual Defendants in their personal capacities.").

In any event, the Court's analysis under Title VII, MFEPA, and 42 U.S.C. § 1981 is the same. See Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc., 921 F.Supp.2d 470, 483 n.20 (D.Md. 2013) ("[M]FEPA claims of discrimination are analyzed under the same framework as Title VII."); Sanders v. Tikras Tech. Sols. Corp., 725 F.App'x 228, 229 (4th Cir. 2018) ("The McDonnell Douglas framework was initially developed for Title VII discrimination cases but since the McDonnell Douglas decision, the framework has been held to apply in discrimination cases arising under § 1981 and in retaliation cases under Title VII and § 1981" (citation omitted)); Anthony v. United Airlines, Inc., No. 24-2128, 2026 WL 35963, at \*2 n.2 (4th Cir. Jan. 6, 2026) ("There is no dispute that all of Appellant's retaliation claims [under] 42 U.S.C. § 1981 and Title VII can be considered together."). Accordingly, the Court will dismiss without prejudice Hunt's MFEPA claims in their entirety, Hunt's Title VII claims against the named individual defendants and her 42 U.S.C. § 1981 claims against the Department and Smith and

10

Callahan in their official capacities but will otherwise analyze Hunt's Title VII and 42 U.S.C. § 1981 claims below.[4]

### 2. Discrimination

The Court will next address Hunt's allegations of discrimination. Title VII prohibits an employer from discriminating against employees due to race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). A plaintiff may establish a Title VII claim "either 'through direct and indirect evidence of retaliatory [or discriminatory] animus,' or through a burden-shifting 'pretext' framework." Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018) (quoting Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015)).

The Complaint does not include allegations of direct evidence of discrimination. See Cole v. Fam. Dollar Stores of Md., Inc., 811 F.App'x 168, 175 (4th Cir. 2020) ("Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'") (quoting Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir. 1999)). Accordingly, the Court will evaluate Hunt's claim under the burden-shifting framework first articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

---

[4] Hunt names Carolyn Scruggs, Secretary of the Department of Public Safety and Correctional Services as a defendant and therefore Hunt's claims against the Department under Title VII may proceed. See Simmons v. Shalala, 946 F. Supp. 415, 418 (D. Md. 1996) ("The head of the department or agency is the only proper defendant" in a Title VII action claiming employment discrimination.)

To establish a discrimination or retaliation claim under the <u>McDonnell Douglas</u> burden-shifting framework, Hunt must <u>eventually</u> put forth a prima facie case by establishing that:

> (1) [s]he belongs to a protected class;
> (2) [s]he suffered an adverse employment action;
> (3) at the time of the adverse action, [s]he was performing h[er] job at a level that met h[er] employer's legitimate expectations . . . ; and
> (4) [s]he was rejected [or disciplined] under circumstances giving rise to an inference of unlawful discrimination.

See <u>Adams v. Trs. of the Univ. of N.C.-Wilmington</u>, 640 F.3d 550, 558 (4th Cir. 2011) (citing <u>Taylor</u>, 193 F.3d at 230). The precise formulation of the required prima facie showing will vary in "differing factual situations," <u>McDonnell Douglas</u>, 411 U.S. at 802 n.13, and the elements were "never intended to be rigid, mechanized, or ritualistic," <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506, 512 (2002) (quoting <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577 (1978)). If Hunt succeeds in establishing a prima facie case, the burden shifts to the employer to "present a legitimate, non-discriminatory reason for its employment action." <u>Mackey v. Shalala</u>, 360 F.3d 463, 468 (4th Cir. 2004) (quoting <u>Evans v. Tech. Applications Serv. Co.</u>, 80 F.3d 959 (4th Cir. 1996)). If the employer does so, "the burden shifts back to the employee to show that the given reason was just a pretext for discrimination." <u>Id.</u>

The Court is mindful that a Title VII plaintiff need not satisfy all the elements set forth above to survive a motion to dismiss. See <u>Swierkiewicz</u>, 534 U.S. at 510 ("The prima facie case under <u>McDonnell Douglas</u>, however, is an evidentiary standard, not a pleading requirement."); <u>accord</u> <u>Parker v. Child.'s Nat'l Med. Ctr., Inc.</u>, No. ELH-20-3523, 2021

WL 5840949, at *9 (D.Md. Dec. 9, 2021) ("At the motion to dismiss stage, a plaintiff need not establish a prima facie case of discrimination."). Instead, at the motion to dismiss stage, a plaintiff need only "allege[] facts that plausibly state a violation of Title VII 'above a speculative level.'" Bing v. Brivo Sys., LLC, 959 F.3d 605, 617 (4th Cir. 2020) (quoting Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010)), cert. denied, 141 S.Ct. 1376 (2021). Thus, the plaintiff must generally show that the employer took adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981); Adams, 640 F.3d at 558 (citing Taylor, 193 F.3d at 230). This requirement can be met by showing that "similarly-situated employees outside the protected class received more favorable treatment." White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004).

The Court considers the "totality of the circumstances" in determining whether Hunt has adequately alleged discrimination. See Strothers v. City of Laurel, Md., 895 F.3d 317, 330–31 (4th Cir. 2018) ("[T]he connection between animus and conduct may be inferred from the totality of the circumstances."); see also Woods v. City of Greensboro, 855 F.3d 639, 649 (4th Cir. 2017) (concluding that a court "may infer discriminatory intent from evidence of a general pattern of . . . discrimination in the practices of a defendant"); Guirkin v. CMH Physician Servs., LLC, No. 3:20cv59, 2020 WL 6829769, at *7 n.13 (E.D.Va. Nov. 20, 2020) ("Although [plaintiff's] individual allegations do not by themselves prove discriminatory animus, the totality of circumstances surrounding his termination gives rise to the inference that [plaintiff] was fired, at least in part, because of his [protected status].").

13

Here, the only element that Defendants contest is the second element regarding adverse action. (Mot. at 8–10). That is, Defendants insist that Hunt did not suffer an adverse employment action because she was not demoted, her pay did not decrease, nor were her responsibilities taken away. (Id.). The Court, however, rejects such a narrow view of what constitutes adverse action. An adverse employment action is "a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 122 (4th Cir. 2021) (quoting Chang Lim v. Azar, 310 F.Supp.3d 588, 601 (D.Md. 2018)). Hunt takes issue with multiple conditions of her employment, including, for example: (1) the disproportionately high caseload that Smith assigned her as compared to her alleged-similarly-situated comparators; (2) Smith manipulating her schedule such that Hunt was no longer able to earn flex time in contrast to her alleged-similarly-situated comparators; and (3) Smith and Callahan altering Hunt's duty schedule to remove the experienced partner who worked with Hunt, leaving Hunt as the only agent to fully able process intakes, and thereby increasing her workload. (Compl. ¶¶ 37–61, 124, 130–161).

The Court is satisfied that Hunt adequately alleges adverse action because, viewing the facts in the light most favorable to Hunt, all the employment decisions she contests appear to have worsened the conditions of her employment. (Id.). While Defendants may ultimately prevail in proving that these decisions were not made on the basis of a protected class, that determination is not before the Court at the 12(b)(6) stage. Accordingly, the Court denies Defendants' Motion as it relates to discrimination under Title VII and 42 U.S.C. § 1981.

### 3.    Retaliation

Hunt also brings claims for retaliation. (Compl. ¶¶ 165–172, 181–92). Title VII prohibits an employer from retaliating against an employee who exercises his Title VII rights. Hart v. Lew, 973 F.Supp.2d 561, 582 (D.Md. 2013). To establish a prima facie claim of retaliation under Title VII, Hunt "must show that [she] engaged in protected activity, that [her employer] took adverse action against [her], and that a causal relationship existed between the protected activity and the adverse employment activity." Id. (quoting Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2011)). If she succeeds in establishing a prima facie case, the McDonnell Douglas framework applies, just as it does for a discrimination claim: "If a plaintiff puts forth sufficient evidence to establish a prima facie case of retaliation and a defendant offers a non-discriminatory explanation for the adverse action, the plaintiff bears the burden of establishing that the employer's proffered explanation is pretext." Id. (citation modified).

Regarding the first element, Title VII makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Protected activity, "therefore, can take the form of either opposing a practice prohibited under Title VII ([under] the opposition clause) or making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII ([under] the participation clause)." Pitter v. Cmty. Imaging Partners, Inc., 735 F.Supp.2d 379, 395 (D.Md. 2010). "The opposition clause has been held

15

to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." Id. at 396 (quoting Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981).

The Court finds that Hunt has stated a prima facie case of retaliation. First, around January 17, 2024, Hunt alleges that she engaged in at least one act of protected activity by meeting with Callahan and explaining that "she was concerned about the hostile environment created by Defendant Smith and that Ms. Hunt did not feel as if she would be successful in her job if she continued to be supervised and under the tutelage of Defendant Smith." (Compl. ¶ 72). Hunt asked Callahan to transfer her to a different supervisor, but Callahan refused. (Id. ¶ 73). Hunt also met directly with Smith and voiced her concerns to her as well. (Id. ¶¶ 50–52). Second, Defendants took adverse action against Hunt by worsening her employment conditions, including, for example, "continuing to make unreasonable requests of Ms. Hunt" that increased her workload like providing reports for individuals without court dates despite initially being told that such work was unnecessary, despite other similarly situated comparators allegedly not having this type of workload. (Id. ¶¶ 83–84, 160). Third, Hunt alleges that at least some of these actions occurred a few days after her phone call to Callahan in which she reported some of Smith's unreasonable and hostile behavior, which, at this stage, is sufficient to allege causal connection. (Id. ¶¶ 77–84); see Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) ("[E]vidence that the alleged adverse action occurred shortly after the

16

employer became aware of the protected activity is sufficient to 'satisf[y] the less onerous burden of making a prima facie case of causa[tion].'").

Hunt has pleaded a prima facie case of retaliation because she has alleged all three elements. See Hart, 973 F.Supp.2d at 582. Under the McDonnell-Douglas framework, the burden then shifts to Defendants to offer a non-discriminatory explanation for the adverse action. See id. Defendants proffer no explanation for the adverse decisions because they assert that these conditions were not materially adverse. (Mot. at 8–10). Because the Court has already found otherwise, Hunt's retaliation claim will proceed.

At this stage, the Court finds that Hunt has alleged facts "supporting a plausible inference that [the employer took an adverse employment action against the plaintiff] 'because' of [the plaintiff's] protected activity." Barbour v. Garland, 105 F.4th 579, 590 (4th Cir. 2024) (quoting Holloway v. Maryland, 32 F.4th 293, 300 (4th Cir. 2022)). The Fourth Circuit recently explained that "[a] complaint . . . will survive a Rule 12(b)(6) motion so long as the employer's explanation 'does not render [the complaint's] allegations implausible.'" Id. (quoting Woods v. City of Greensboro, 855 F.3d 639, 649 (4th Cir. 2017)). Here, Defendants fail to offer "an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation that [] renders [Hunt's] claim of pretext implausible." Id. Accordingly, Defendants' Motion will be denied as to the retaliation claim under Title VII and 42 U.S.C. § 1981.

### 4.    Hostile Work Environment

To the extent Hunt seeks to allege a hostile work environment claim, such a claim fails to pass 12(b)(6) muster. To state a hostile work environment claim, a plaintiff must

plead that there is "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (quoting Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011)). A hostile environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation omitted).

In determining whether the offending conduct was sufficiently severe or pervasive, the court must consider: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." Whittaker v. David's Beautiful People, Inc., No. DKC 14-2483, 2016 WL 429963, at *4 (D.Md. Feb. 4, 2016) (quoting Smith v. First Union Nat. Bank, 202 F.3d 234, 242 (4th Cir. 2000)).

Here, Hunt's strongest claim falls under the third factor because she alleges that during one meeting that she had with Smith, "Smith's hands were so close to Ms. Hunt's face that she had to take a step back to avoid being hit by Defendant Smith." (See Compl. ¶¶ 69–70). Taking Smith's allegation as true, this interaction may amount to at least a threat of physical harm or perceived threat of harm. Even so, while deeply regrettable, the Court agrees that "[i]ntermittent acts of harassment are insufficient to establish that a hostile work environment is severe or pervasive." (Mot. at 11 (citing Greene v. A. Duie Pyle, Inc., 371

18

F.Supp.2d 759, 762–63 (D.Md. 2005))). Rather, "courts usually only allow hostile work environment claims to proceed where the discriminatory abuse is near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance." Tawwaab v. Va. Linen Serv., Inc., 729 F.Supp.2d 757, 777 (D.Md. 2010). The Fourth Circuit has made clear that "[i]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." Perkins v. Int'l Paper Co., 936 F.3d 196, 208 (4th Cir. 2019). In other words, "[r]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." Id. (quoting Sunbelt, 521 F.3d at 315–16).

That is the case here: Smith does not allege abusive discriminatory conduct that is "near constant" or otherwise sufficiently severe. Tawwaab, 729 F.Supp.2d at 777. While Defendants may have failed to provide Hunt with "proper guidance, mentoring, and supervision," (Compl. ¶ 148), the conduct alleged here falls short of "clear[ing] [the] high bar" of pleading a hostile work environment claim. Perkins, 936 F.3d at 208 (quoting Sunbelt, 521 F.3d at 315). Accordingly, Hunt's claims for hostile work environment will be dismissed.

### 5.   Negligence and Negligent Supervision

Lastly, Hunt alleges claims of negligence and negligent supervision. (Compl.¶¶ 218–241). Such claims may be predicated only on common law causes of action. Greenan v. Bd. of Educ. of Worcester Cnty., 783 F.Supp.2d 782, 791 (D.Md. 2011). "Because no common law tort of employment discrimination exists in Maryland," state-

law negligence and "negligent supervision claims [may not be] appended to Title VII cases." Id. In other words, a Plaintiff may not "merely assert that the same set of facts giving rise to a Title VII claim gives rise to a negligence claim." Hurley v. Howard Cnty Dep't of Police, No. CJC-25-1498, 2026 WL 864078, at *17 (D.Md. Mar. 30, 2026) . Here, Hunt's claims arise exclusively from statutorily prohibited employment-related conduct, and not any common law cause of action. (Compl. ¶¶ 12–151). Hunt does not address, much less dispute, these arguments. (Opp'n at 17). Therefore, Counts VII and VIII will be dismissed.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant the Motion to Dismiss in part and deny it in part (ECF No. 22). Defendants shall answer the remaining counts of the Complaint in accordance with the Local Rules and Federal Rules of Civil Procedure. A separate Order follows.

Entered this 29th day of May, 2026.

_____/s/_____

George L. Russell, III
Chief United States District Judge

20